## S13A0670. SEARS v. HUMPHREY.

(751 SE2d 365)

THOMPSON, Chief Justice.

In 1993, Demarcus Sears was convicted of kidnapping with bodily injury and armed robbery in connection with the death of Gloria Wilbur, who was kidnapped and robbed of her automobile in Georgia, raped in Tennessee, and murdered in Kentucky. The jury recommended a death sentence for the kidnapping with bodily injury after finding multiple statutory aggravating circumstances, including that the kidnapping with bodily injury was committed while Sears was engaged in the commission of the capital felony of murder.[1] The trial court sentenced Sears to death for the kidnapping with bodily injury in accordance with the jury's recommendation, see OCGA § 17-10-31 (a), and to a life sentence for the armed robbery. After affirming each of his convictions and the life sentence for the armed robbery, this Court remanded the case for further proceedings related to Sears' claim of jury misconduct at the sentencing phase. See *Sears v. State*, 268 Ga. 759 (493 SE2d 180) (1997). This Court subsequently affirmed Sears' death sentence. See *Sears v. State*, 270 Ga. 834 (514 SE2d 426) (1999).

In 2000, Sears filed a petition for a writ of habeas corpus, alleging among other claims that his trial counsel rendered ineffective assistance of counsel, and an evidentiary hearing was held in 2006. In an order filed on January 9, 2008 ("2008 Order"), the habeas court denied Sears' petition, and this Court denied Sears' application for a certificate of probable cause to appeal upon concluding that it lacked "arguable merit." Supreme Court Rule 36. However, in a per curiam opinion, the Supreme Court of the United States granted Sears' petition for a writ of certiorari and held that, with regard to Sears' ineffective assistance of trial counsel claim, the habeas court failed to conduct a proper prejudice analysis under *Strickland v. Washington*, 466 U. S. 668, 694 (III) (B) (104 SCt 2052, 80 LE2d 674) (1984). See *Sears v. Upton*, 561 U. S. 945 (130 SCt 3259, 3267 (III), 177 LE2d 1025) (2010). The Supreme Court then vacated this Court's order denying Sears' application for a certificate of probable cause to appeal and remanded the case for further proceedings not inconsistent with

---

[1] Under Georgia law, a jury may "impose a death sentence for the offense of kidnapping with bodily injury on the ground that the offense of kidnapping with bodily injury was committed while the offender was engaged in the commission of the capital felon[y] of murder. . . ." *Potts v. State*, 261 Ga. 716, 720 (3) (410 SE2d 89) (1991); OCGA § 17-10-30 (b) (2). See *Stanley v. State*, 240 Ga. 341, 350 (9) (241 SE2d 173) (1977) ("The death penalty for kidnapping with bodily injury is not unconstitutional where the victim is killed." (citing *Coker v. Georgia*, 433 U. S. 584 (97 SCt 2861, 53 LE2d 982) (1977)).

its opinion. Id. Pursuant to the Supreme Court's mandate, this Court vacated the habeas court's judgment and remanded the case to the habeas court for further proceedings not inconsistent with the Supreme Court's mandate.

After a new habeas judge was assigned to the case and after a hearing was subsequently conducted on June 3, 2011, the habeas court entered a new order on August 16, 2011 ("2011 Order"), which adopted the 2008 Order with regard to all of Sears' claims except for his ineffective assistance of counsel claim, thereby once again denying him relief on those claims. With regard to Sears' ineffective assistance claim, the habeas court concluded that, even if he could prove that trial counsel rendered deficient performance, Sears had failed to prove that he was constitutionally prejudiced as a result. Accordingly, the habeas court denied Sears relief on his ineffective assistance claim. See Lajara v. State, 263 Ga. 438, 440 (3) (435 SE2d 600) (1993) (stating that a court need not address counsel's performance if an ineffective assistance claim can be rejected based on a lack of prejudice). This Court granted Sears' application for a certificate of probable cause to appeal from the 2011 Order. For the reasons set forth below, we affirm the habeas court's denial of Sears' habeas petition.

## I. *Brief Factual Background*

The evidence at trial showed that Demarcus Sears and Phillip Williams were stranded in Atlanta on the afternoon of October 7, 1990, because their automobile had broken down. Wishing to return to the Cincinnati area where they lived, they walked to a Waffle House in Smyrna, where Sears unsuccessfully tried to sell to patrons in the restaurant certain items that he was carrying with him in a black briefcase, including knives, brass knuckles, and a set of handcuffs that had no key. After leaving the Waffle House, Sears and Williams walked to a Kroger grocery store, where they decided to steal an automobile to drive home. They chose Gloria Wilbur as their victim when she parked her automobile and entered the Kroger store. Around 8:00 p.m., when Wilbur returned to her automobile, Sears struck her with brass knuckles and forced her inside the vehicle. Williams got behind the wheel, and they drove north on Interstate 75. While they were driving through Tennessee, Sears raped Wilbur. Shortly after entering Kentucky around 1:00 a.m., they stopped the automobile, and Sears took Wilbur into the bushes along Interstate 75 and stabbed her to death. Her abandoned automobile was discovered in a Cincinnati suburb later on October 8, and her body was found almost a week later. Bloodstains in the automobile matched Wilbur, and pubic hair taken from the back seat matched Sears.

## II. *Ineffective Assistance of Counsel Claim*

Sears contends that the habeas court erred for various reasons in again denying his ineffective assistance of counsel claim. Specifically, Sears asserts that the habeas court violated the Supreme Court's mandate in multiple ways,[2] unreasonably discounted much of the evidence that he submitted regarding his background and mental impairments,[3] and erred in finding that he was not prejudiced by trial counsel's deficiencies.[4]

A. *Applicable Law*

Under the governing principles of *Strickland*, 466 U. S. at 687 (III) (A), a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced the defense in order to prevail on an ineffective assistance of counsel claim. See *Smith v. Francis*, 253 Ga. 782, 783-784 (1) (325 SE2d 362) (1985). The inquiry with regard to *Strickland*'s first prong is highly deferential toward counsel's judgment, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U. S. at 689 (III) (A). A petitioner must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Citation and punctuation omitted.) Id.

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Smith*, 253 Ga. at 783 (1) (citing *Strickland*, 466 U. S. at 694 (III) (B)). In reviewing a habeas court's ruling on an ineffective assistance claim, "[w]e accept the habeas court's findings of fact unless clearly erroneous and independently apply the law to those facts." *Head v. Hill*, 277 Ga. 255, 266 (VI) (587 SE2d 613) (2003).

B. *Whether the Habeas Court Violated the Supreme Court's Mandate*

As an initial matter, we address Sears' claim that the habeas court violated the Supreme Court's mandate in several ways. First, Sears contends that the habeas court violated the mandate by addressing trial counsel's performance in its 2011 Order. The habeas

---

[2] See subdivision B.
[3] See subdivision D (2).
[4] See subdivision D.

court concluded in the 2008 Order that Sears had demonstrated that his counsel's sentencing phase investigation was constitutionally deficient based upon its finding that "counsel's investigation into mitigation evidence [was] limited to one day or less, talking to witnesses selected by [Sears'] mother." The habeas court concluded nevertheless that, "[b]ecause counsel put forth a reasonable theory with supporting evidence," Sears had failed to prove prejudice. Because the Supreme Court concluded that the habeas court erred in its "analysis regarding whether counsel's facially inadequate mitigation investigation prejudiced Sears," *Sears v. Upton*, 130 SCt at 3264 (II), Sears claims that the habeas court violated the mandate issued by the Supreme Court by re-examining trial counsel's performance[5] when that issue was not before the habeas court on remand. See *Briggs v. Penn. R. Co.*, 334 U. S. 304, 306 (68 SCt 1039, 92 LE 1403) (1948) (holding that "an inferior court has no power or authority to deviate from the mandate issued by an appellate court"); *In re Sanford Fork & Tool Co.*, 160 U. S. 247, 255 (16 SCt 291, 40 LE 414) (1895) ("When a case has been once decided by th[e Supreme C]ourt on appeal, and remanded to [a lower c]ourt, whatever was before th[e Supreme C]ourt, and disposed of by its decree, is considered as finally settled.").

However, we do not read the language of *Sears v. Upton* as establishing that the Supreme Court "disposed of" either prong of Sears' ineffective assistance claim. See *In re Sanford Fork & Tool Co.*, 160 U. S. at 256 (stating that "[t]he opinion delivered by th[e Supreme C]ourt, at the time of rendering its decree, may be consulted to ascertain what was intended by its mandate"). Rather, we read the remanding opinion as showing that the Supreme Court only *assumed* for the purposes of its discussion the correctness of the 2008 Order's conclusion that trial counsel conducted a " 'constitutionally inadequate' " investigation. *Sears v. Upton*, 130 SCt at 3261 (stating that the evidence that Sears presented in his habeas proceeding "was not brought to light" at the time of his trial "because — *in the words of the state [habeas] court* — [Sears'] counsel conducted a penalty phase investigation that was 'on its face . . . constitutionally inadequate' " (quoting Sears' App. to Pet. for Cert. 27B (emphasis supplied)); id. at 3264 (II) (stating that "*[i]n [the habeas court's] view*, the cursory nature of counsel's investigation into mitigation evidence . . . was 'on

---

[5] While the habeas court in one place disavowed "specifically ruling" on the performance prong of *Strickland*, it later concluded that "trial counsel made a reasonable strategic decision regarding a mental health evaluation in [Sears'] case."

its face . . . constitutionally inadequate' " (quoting Sears' App. to Pet. for Cert. 27B (emphasis supplied)).

Our reading of the Supreme Court's opinion is sound. First, the Supreme Court did not explicitly engage with any evidence in the record regarding trial counsel's performance. Compare, e.g., *Wiggins v. Smith*, 539 U. S. 510, 523-534 (II) (B) (1)-(3) (123 SCt 2527, 156 LE2d 471) (2003); *Williams v. Taylor*, 529 U. S. 362, 395-396 (IV) (120 SCt 1495, 146 LE2d 389) (2000); *Strickland*, 466 U. S. at 699 (V). Second, the Supreme Court never stated that it agreed with the habeas court that the assistance rendered by Sears' trial counsel was constitutionally deficient. Compare *Kimmelman v. Morrison*, 477 U. S. 365, 387 (III) (A) (106 SCt 2574, 91 LE2d 305) (1986) (stating that the Court "agree[d] with the District Court and the Court of Appeals that the assistance rendered [to the defendant] by his trial counsel was constitutionally deficient"). Therefore, we conclude that *neither prong* of Sears' ineffective assistance of counsel claim was finally disposed of by the Supreme Court.

Sears also claims that the 2011 Order violated the mandate by "disparag[ing] or willfully ignor[ing] the findings of the Supreme Court" regarding the credibility of Sears' new evidence presented in the habeas proceeding. However, our review of the remanding opinion clearly shows that the Supreme Court did not engage in a critical review of the actual record as would be necessary in assessing such evidence for credibility but that, instead, the Court simply took Sears' new evidence at face value for purposes of its discussion.[6] See *Sears v. Upton*, 130 SCt at 3269 (Scalia, J., dissenting) (noting that the Supreme Court did not conduct a "fact-intensive inquiry into the 22-volume record to measure the persuasiveness" of Sears' new evidence). Moreover, the Supreme Court held that "it [wa]s for the state court — and not for . . . th[e Supreme] Court . . . — to undertake th[e] reweighing [required by *Strickland* that the habeas court failed to conduct] in the first instance." *Sears v. Upton*, 130 SCt at 3267 (III).

---

[6] For instance, the Court twice noted that Sears' habeas experts attributed Sears' brain "abnormality" to the "significant frontal lobe brain damage Sears suffered as a child, as well as drug and alcohol abuse in his teens." *Sears v. Upton*, 130 SCt at 3261. See also id. at 3262 (I) (stating that Sears' mental health experts testified that Sears' mental deficits were the result of childhood head injuries, "as well as drug and alcohol abuse"). Although one of Sears' habeas experts stated in his affidavit that deficits like those that Sears exhibited "are typically seen in patients with a history of . . . extensive use of drugs and alcohol," *neither* of Sears' habeas experts attributed Sears' mental deficits to alcohol abuse. Moreover, there is no evidence in the record that Sears ever abused alcohol. On the contrary, one of Sears' experts stated in his report that "[Sears] denied any history of problematic use of alcohol and observed that he had become intoxicated only once in his life," and the expert testified in his deposition that Sears was "atypical" in that respect in that "[m]ost patients report very high alcohol use when they abuse drugs, particularly a stimulant compound like cocaine."

Thus, the Supreme Court never intended to address factual findings and credibility determinations regarding Sears' evidence. If it had, the Supreme Court would not have vacated this Court's judgment and remanded Sears' case for the state court to conduct the reweighing required by *Strickland*, but instead would have applied both prongs of a *Strickland* analysis to the record as it viewed it. See *Wiggins*, 539 U. S. at 534 (III) (assessing prejudice on the record where "neither of the state courts below reached this prong of the *Strickland* analysis"). Accordingly, we conclude that the Supreme Court did not make binding conclusions regarding Sears' new evidence.

Sears also contends that the habeas court ignored the Supreme Court's mandate by failing to "consider the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding — and reweig[h] it against the evidence in aggravation." (Citation and punctuation omitted; alteration in original.) *Sears v. Upton*, 130 SCt at 3266 (II). We disagree. "That the court organized its discussion of the evidence in a piecemeal fashion is of no moment." *Ponticelli v. Secretary, Dept. of Corrections*, 690 F3d 1271, 1300 (III) (B) (2) (11th Cir. 2012) (explaining that the existence of item-by-item analysis is not inconsistent with a cumulative analysis). Furthermore, while this Court is required to accept the habeas court's factual findings unless clearly erroneous, we are also required to independently apply the legal principles to the facts. See *Hall v. McPherson*, 284 Ga. 219, 233 (5) (663 SE2d 659) (2008). In other words, we must conduct our *own* reweighing of the mitigating and aggravating evidence.

Finally, Sears contends that the habeas court erred in the 2011 Order by making factual findings and legal conclusions that "cannot be reconciled with prior findings" in the 2008 Order. However, the 2008 Order was *vacated*, which means that it was nullified or canceled. See Black's Law Dictionary (9th ed. 2009) (defining "vacate" as "[t]o nullify or cancel; make void; invalidate"). Thus, the habeas court was not constrained by the 2008 Order. Although the habeas court stated in the 2011 Order that it was not "expressly address[ing]" trial counsel's performance, the habeas court's factual findings coupled with the undisputed testimony in the record are adequate to enable this Court to apply *Strickland*'s performance prong directly to the facts of Sears' case.

C. *Trial Counsel's Performance with Regard to the Sentencing Phase*

A review of the relevant undisputed facts in the record and the factual findings of the habeas court that are supported by the record shows the following facts. Both Sears and Williams were interviewed

by police on November 1, 1990, after they became suspects in Wilbur's murder based on a tip by an Ohio informant and an identification by witnesses at the Waffle House who heard about the discovery of Wilbur's handcuffed body. Immediately after his interview began, Sears told police that Wilbur was entering her automobile in the Kroger parking lot when Williams struck her in the head with brass knuckles, put her in her automobile, and "wheeled around" to pick him up. Sears also told police that he alone raped Wilbur about an hour after she had been seized and that, once they entered Kentucky, he also stabbed her in the neck with a knife after taking her from the automobile and "down the side" of the highway. After making his statement, Sears consented to a search of his parents' home where he lived in order to show the police the brass knuckles and the briefcase containing knives that witnesses had described seeing him with on the day of Wilbur's abduction. Williams made a statement that matched Sears', except that he claimed that it was actually Sears who struck Wilbur with the brass knuckles and forced her into the automobile.

Shortly after Sears and Williams were returned to Georgia to face armed robbery and kidnapping charges in connection with Wilbur's death, the trial court appointed Ray Gary, Jr., as lead counsel and Michael Treadaway as co-counsel to represent Sears. When appointed, Gary had been a member of the Georgia bar for over fifteen years, had previously served as a Cobb County assistant solicitor and as a magistrate judge with solely criminal jurisdiction, had been practicing primarily criminal defense for ten years, and had tried approximately six murder cases, including a death penalty case. Treadaway had been a litigator for thirteen years, had tried approximately a dozen murder cases, and had been involved in three death penalty cases, including handling one such case through trial.

Prior to Sears' first proceeding, see Unified Appeal Procedure § II (C), 17-year-old Williams, who was indicted with Sears, pled guilty and agreed to testify against Sears in exchange for two consecutive life sentences. Although trial counsel argued strenuously for the exclusion of Sears' statement and the suppression of the evidence obtained incident to the warrantless search of Sears' parents' home, their efforts were unsuccessful. In light of the considerable evidence against Sears, counsel began almost immediately to prepare a mitigation defense. Shortly after his appointment, Gary contacted Sears about recording evidence from him regarding his "background, family history, [and] social history." Counsel testified that they told Sears

why they were interested in those matters, explained to him what mitigating evidence was, gave him examples of mitigating and aggravating evidence, and obtained the names of persons whom Sears believed would be good witnesses for him.

At the time of his arrest, Sears was 18 years old, was residing with his parents, and, according to his mother, had recently re-enrolled in high school after having withdrawn from school while in the eleventh grade. Trial counsel testified that they "knew from personal experience that teenage boys are not particularly insightful or reliable," and, therefore, they also sought assistance from Sears' parents concerning his background. They learned that Sears was the second oldest of four children born to Frank and Virginia Sears, both college-educated professionals, and that the family resided in a suburban middle-class neighborhood near Cincinnati.

At Sears' arraignment, Gary obtained funds from the trial court to enable Treadaway and him to travel to Kentucky and Ohio to investigate the case. Trial counsel testified that there was a "need for speedy development of mitigation case evidence so that [counsel] could make an informed decision whether to pursue funds for a [mental health expert]." They explained that this was particularly important because the discovery rule in *Sabel v. State*, 248 Ga. 10, 18 (6) (282 SE2d 61) (1981), was in effect at the time of Sears' trial.[7] That rule required any report by a defense expert to be reduced to writing and turned over to the State, even if the report were unfavorable and the defense elected not to call the expert as a witness.

Counsel testified that Sears appeared to have a good relationship with his mother and that she was particularly helpful in his case. Counsel also testified that they arranged for Sears' mother to gather persons[8] at her home so that counsel might meet with them to obtain information about Sears' character and about his life in his neighborhood and at school in order to determine what kind of mitigation case they might be able to develop without pursuing expert mental health testimony. Counsel were told in advance that Sears' father would be away on business at the time of their visit, and they made plans to and did speak with him later.

---

[7] Less than a year after Sears' trial, this Court overruled *Sabel*. See *Rower v. State*, 264 Ga. 323, 325 (5) (443 SE2d 839) (1994).

[8] Trial counsel testified in their joint affidavit that these persons were "selected" by Ms. Sears. However, Gary testified in his deposition that counsel obtained the names of these witnesses from Sears himself, and Treadaway testified that, although he could not specifically recall the occasion, he was sure that counsel discussed with Sears whom they should interview as mitigation witnesses, that he did not recall that the individuals interviewed at Sears' parents' home were selected by Sears' mother, and that their names could have been provided by Sears *and* his mother. The habeas court did not resolve the conflict in the 2011 Order.

While at the Sears' home, trial counsel interviewed Sears' mother, who told trial counsel that Sears had had a disagreement with his parents after their discovery that Sears' 15-year-old girlfriend had stayed overnight in his bedroom, that he had decided to move out of the home, that Williams had assisted him with his move, and that Sears had moved back into his parents' home shortly after the crimes and before his arrest. Sears' mother, who had an associate's degree in social services and who had worked in mental health for a number of years, stated that Sears "was a reasonably normal child" despite his having experienced behavioral and academic problems at school and that his only previous legal problems consisted of a charge for possession of a counterfeit controlled substance as a juvenile and recent charges for forgery stemming from a theft of checks by Williams.

Trial counsel also interviewed approximately a dozen potential mitigation witnesses, speaking with each person privately. A review of the transcripts of counsel's audiotaped interviews shows that counsel explored pertinent areas of mitigation, such as Sears' relationship with his mother, his father, and his siblings. The witnesses stated that Sears had "always gotten along fine" with every family member, that he was "a good brother," that he got along "[g]reat" with his twin sisters "as far as babysitting [them], taking care of them, [and] being patient with them," and that he also had a good relationship with his older brother, although there was "a little sibling rivalry." Witnesses also stated that Sears' parents were "decent" and "caring people" who had apparently "invested . . . a lot in the well being of their children" and that Sears appeared to get along fine with his father, had a "healthy," "excellent[,] and open relationship" with his mother, and "never complained" about either parent.

Trial counsel also asked whether the potential witnesses knew if Sears suffered from any drug, psychiatric, or behavioral problems. Sears contends that the habeas court ignored evidence that some of these persons expressed concerns about Sears' mental health by concluding that it was "difficult to reconcile" the expert mental health testimony that Sears presented in the habeas proceeding that he was

> "among the most impaired individuals in the population in terms of his ability to suppress competing impulses and conform behavior only to relevant stimuli" with the fact that no one close to [him], including those trained in mental health professions, . . . relayed this information to trial counsel.

In this regard, Sears points to two potential witnesses whom trial

counsel interviewed, Josie Russell and Sears' ninth grade counselor.[9]

Russell, who identified herself as Sears' neighbor and a psychiatric nurse, told counsel that she had tried to talk Sears into seeing a psychiatrist. When trial counsel asked Russell about the reasons for her concern, she listed the following: Sears told her that he was unable to sleep and that he was "seeing" a psychologist[10] because he was bored with school; all he talked about was the music and recording business; "he wouldn't be with the rest of the kids" but, instead, stood across the street from them "totally engrossed" in himself "with that blank stare on his face"; and she sometimes had difficulty getting his attention to say hello when she passed him. Russell also stated that Sears did not carry drugs on him, that she did not think that his behavior was the result of drug use or that he used drugs, that she had never seen any violent tendencies in him, that she was "[v]ery much" surprised to hear what he was accused of, and that he was independent, a leader, and "a nice young man."

As to Sears' former counselor, after the counselor told trial counsel that Sears had entered the Severe Behavior Handicap ("S.B.H.") program in high school, trial counsel asked her why Sears' behavior was "like it was." She replied that she "was not quite sure" and that counsel needed to see his test results. However, she continued by explaining that Sears' behavioral problems consisted of his "not seem[ing] able to stay on task all the time," "not concentrat[ing]" if he were in the back of the classroom, and making distracting noises. She added that Sears did not have a problem with authority or any violent tendencies and that he was "courteous" and "a nice person to talk to."

Thus, both potential witnesses whom Sears highlighted gave responses to counsel's inquiries that did not suggest that Sears was significantly impaired. Furthermore, the habeas court considered both potential witnesses' statements, as a review of the 2011 Order shows that the court quoted from each of their interviews with counsel, stating that counsel had been told that Sears "had seen a psychologist because he was 'bored with school' " and that he had been placed "in the Severe Behavioral Handicap Program at school because 'he did not seem able to stay on task all the time' and because he was misbehaving in class and distracting the other students." However, as the habeas court noted, several other potential witnesses

---

[9] Both of these persons testified in the sentencing phase of Sears' trial.

[10] While Sears' school records show that he was *evaluated* on at least one occasion by a school psychologist, there are no indications in Sears' school records or in any other exhibits that were submitted in his habeas proceedings that Sears was ever under the care of a psychologist prior to his commission of the crimes.

told counsel that they had never seen any indications that Sears needed psychiatric treatment and that they believed that he was a normal teenager. The habeas court quoted three of these potential witnesses' statements indicating that there was nothing unusual about Sears or his behavior; two of these potential witnesses worked in the mental health field and a third had known Sears for at least a decade. Given that the reasons that Russell gave for her concerns about Sears' mental health were not particularly persuasive in light of her other statements, that Sears' former counselor indicated that Sears did not exhibit any serious behavioral issues, and that the statements of other persons interviewed by counsel indicated that there was nothing unusual about Sears' behavior, we conclude that the habeas court's finding was not clearly erroneous.[11]

Trial counsel also inquired as to whether the potential witnesses had ever known Sears to be violent, to possess weapons, or to "hate white people,"[12] and they consistently answered in the negative. Instead, they described Sears as "friendly," "courteous," "independent," "honest," and a "typical" teenager. They also stated that they "[had] no idea that [Sears] would ever be involved in or do anything like this," that they "never thought he was capable of that sort of thing," and that he must have been "at the wrong place at the wrong time." While some of the potential witnesses knew that Sears was familiar with knives, they explained that it was in the context of his hunting and fishing with his father. Trial counsel testified that they were impressed by the fact that those interviewed uniformly reported that Sears' behavior during the crimes was totally out of character for him. Furthermore, Sears had no violence in his history, and trial counsel testified that he appeared "pleasant, polite, and generally compliant" to them.

We also note that counsel interviewed a variety of people, including neighbors, long-time family friends, Sears' former high school counselor, a woman for whom he had babysat, and a young woman who had attended school with him. Those interviewed stated that they knew Sears personally, that he was frequently in their homes, that they regularly interacted with him, and that they had watched him grow up and had observed his relationship with his parents, his siblings, and people in the community. Several potential witnesses

---

[11] Pretermitting whether the habeas court erroneously relied on this factual finding in its prejudice analysis as Sears contends, we have not considered it in conducting our own independent prejudice analysis because a reviewing court applying *Strickland*'s prejudice standard must consider the *jury's* perspective, as the question is whether there is a reasonable probability of a different outcome from the *sentencer*. See *Strickland*, 466 U. S. at 695 (III) (B).

[12] Sears is African-American, and the victim was Caucasian.

stated that they had often spoken with Sears by telephone since his incarceration. Counsel's notes regarding their interview with Sears' mother indicate that they asked her to obtain Sears' school records, and Gary's file contained the names and addresses of the schools Sears attended and notes summarizing Sears' school history, including that he transferred to a different high school after "encounter[ing] behavior problems," that he had "numerous suspensions" at both schools, that he left school and moved out of his parents' home in October of 1990, and that he returned home a couple of weeks later. Gary's file also contained notes regarding an interview with a close friend of Sears, Sears' juvenile record, Sears' head injuries, Sears' having "had sex" as a nine-year-old, and the backgrounds of Sears' parents and siblings. After Williams entered his plea, the investigator retained by trial counsel interviewed him in an effort to obtain mitigating evidence.

Shortly after returning from Ohio, trial counsel filed a motion for funds for a psychiatrist and a motion for a presentencing psychiatric examination in the event of Sears' conviction. At the hearing on both motions, trial counsel strenuously argued to the trial court the alleged inequities of the *Sabel* rule and asserted that *Sabel* was wrongly decided. However, the prosecuting attorney correctly argued that *Sabel* was the law in Georgia. At a subsequent hearing, the State requested that it be given notice if Sears' motion for psychiatric funds were granted so that the State could conduct its own evaluation of Sears, and defense counsel inquired of the trial court whether the State would be entitled to have Sears examined and suggested that such an examination raised Fifth Amendment concerns. Shortly thereafter, the trial court and the defense went into an ex parte session, during which defense counsel stated to the trial court without explanation that "[his] client wishe[d] to withdraw" the motion for funds for a psychiatric expert, which trial counsel later did in open court.

Trial counsel testified that, in deciding to withdraw the motion, they considered the fact that the trial judge who was assigned to the case routinely appointed a Georgia Regional Hospital doctor when indigent defendants sought expert psychological assistance. Based on their own experience and discussions with other attorneys who were experienced in obtaining mental health evaluations for their indigent clients in Cobb County, trial counsel did not think that a mental health evaluation by a state doctor was likely to yield anything helpful to Sears. In addition, given Sears' inclination to present himself as a "tough guy," counsel were concerned that, even if he received the warnings required by *Estelle v. Smith*, 451 U. S. 454 (101 SCt 1866, 68 LE2d 359) (1981), and *Miranda v. Arizona*, 384 U. S. 436

(86 SCt 1602, 16 LE2d 694) (1966), Sears might make damaging statements that could be recounted by a court-appointed psychiatrist at trial. Thus, counsel stated that, because of the law at the time, they feared that an evaluation would almost certainly benefit the prosecution. See *Sabel*, 248 Ga. at 18 (6) (holding that the State may call the defendant's expert as a witness if the defendant does not do so, or may argue to the jury that the defendant would have called the expert had the result of the expert's testing been favorable to the defendant).

Counsel also considered their own impression of Sears. In their joint affidavit submitted in the habeas court, counsel stated that "they were impressed by the bizarre affect [that Sears] presented both in speech and demeanor" when they met him and when they listened to his audiotaped confession. However, both attorneys explained at their depositions that what they meant by that statement was that Sears conveyed that he did not appreciate the seriousness of his situation, and they cited the following: Sears enjoyed presenting a "thug image" and appearing different by actions such as wearing "granny glasses" when they were not in vogue and strutting into the courtroom in "a pimp stroll"; he often spoke in rap or "hip-hop" and made "smart-aleck" remarks; he wrote a great deal of poetry containing violent imagery; and he was involved in a large number of disciplinary infractions during his pretrial incarceration. Treadaway indicated that this behavior caused him to question Sears' mental health because it was "outside the norm for the people that [he] had encountered in similar circumstances." However, both attorneys testified that they never had any trouble communicating with Sears. Gary, who spent more time with Sears and who conducted the sentencing phase defense at trial, testified that neither he nor Treadaway saw any behavior by Sears indicating any type of mental deficiency that could be used in mitigation and that, if they had, they would have had Sears evaluated despite the fact that the rule in *Sabel* was in effect at the time of Sears' trial.

Counsel discussed their options with Sears, "advis[ing] him that it was problematic whether the appointment of a mental health expert would be advantageous or necessary to the defense." Both attorneys testified that, after consulting with counsel, it was Sears' choice not to be evaluated. See *Strickland*, 466 U. S. at 691 (III) (A) (stating that it is proper for counsel to base their actions on "informed strategic choices made by the defendant").

According to counsel, they weighed the pros and cons of pursuing the motion for funds for a psychiatrist, considering Sears' choice, their concerns that Sears might make a statement during an evaluation that could be used against him at trial, their personal observations of Sears and "the house he grew up in," the middle-class

environment in which he was raised, and the fact that his parents, "who were normal people," said that there was nothing wrong with him. Counsel then concluded that, all things considered, they could not have Sears examined pretrial "without facing an untenable risk of doing more harm than good." Consequently, trial counsel withdrew the motion for a pretrial psychiatric evaluation but left pending the motion for a presentencing psychiatric examination in the event of a conviction, which counsel testified was designed to mitigate the dilemma posed by *Sabel* in light of the fact that the State's use against Sears of any statements made by him about the crimes was not likely to be as damaging in the sentencing phase as it would be in the guilt/innocence phase. However, the trial court later denied this motion. See *Sears v. State*, 262 Ga. 805, 807 (5) (426 SE2d 553) (1993) (affirming on interim review the trial court's denial), disapproved of on other grounds by *Brogdon v. State*, 287 Ga. 528, 530-531 (2) (697 SE2d 211) (2010). According to their habeas testimony, counsel subsequently decided to develop a mitigation strategy that included "presenting family members, friends, neighbors, and a teacher to testify that the violent outburst in the Wilbur kidnapping was out of character" for Sears, that "his parents were well-thought-of members of their community, [and] that there were people who cared for him" that would be "adversely affected if he were given the death sentence," as well as "emphasiz[ing] his youth and cooperation."[13]

Upon our review of the record and considering the factual findings in the 2011 Order that are supported in the record, we conclude that trial counsel conducted a reasonable investigation for mitigating evidence. We also agree with the habeas court that, "without any indication that [Sears] was suffering from any significant, noticeable disorder," trial counsel made a reasonable strategic decision not to have him evaluated by a mental health expert under the circumstances facing counsel at the time. See *Holladay v. Haley*, 209 F3d 1243, 1250 (III) (A) (3) (11th Cir. 2000) (explaining that counsel are not required to seek an independent evaluation when the defendant does not display strong evidence of mental problems and that the choice not to do so is a tactical decision that is evaluated for

---

[13] Indeed, at the same ex parte hearing at which counsel withdrew their motion for funds for a psychiatric expert, they disclosed to the trial court that their proposed mitigation defense included Sears' mother's testimony that Sears "was generally a child who caused little trouble" other than some "minor behavioral problems" in high school and who came "from a good home" and the testimony of several "close" family friends who were "school teachers and mental health professionals" who "ha[d] known [Sears] all his life" and who "kn[ew] him to do acts of kindness in the past," to be "passive and nonviolent," and to always "demonstrate[ ] basic kindness and courtesy."

reasonableness in all the circumstances, applying deference to counsel's judgment, under *Strickland*). Finally, we conclude that trial counsel developed a reasonable mitigation strategy that included showing the good character of Sears and his family and the impact that a death sentence would have on his family. See *Chandler v. United States*, 218 F3d 1305, 1321, n. 30 (11th Cir. 2000) ("Bringing the family's existence and pain to the attention of the jury is powerful in and of itself."); *Stanley v. Zant*, 697 F2d 955, 969 (1) (11th Cir. 1983) ("[O]ften the best strategy in a capital case is to attempt to humanize the defendant by presenting evidence of his personal qualities.").

D. *Whether Sears Was Prejudiced by Trial Counsel's Performance*

To determine prejudice in the sentencing phase of a case challenging a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U. S. at 695 (III) (B). In conducting this review, this Court must consider the totality of the available mitigating evidence in reweighing it against the evidence in aggravation, while being mindful that a verdict or conclusion with overwhelming record support is less likely to have been affected by errors than one that is only weakly supported by the record. See *Williams*, 529 U. S. at 397-398 (IV); *Strickland*, 466 U. S. at 696 (III) (B).

After conducting such a review, we conclude for the reasons discussed below that, even assuming arguendo that we have misconstrued the Supreme Court's mandate and that the conclusion in the 2008 Order that trial counsel were constitutionally deficient is now the law of the case, Sears' ineffective assistance of trial counsel claim must fail on the entirely separate and independent basis that Sears failed to establish that he was constitutionally prejudiced by trial counsel's performance. See *Strickland*, 466 U. S. at 687 (III) (holding that a convicted defendant must show *both* deficient performance *and* prejudice in order to obtain reversal of his conviction or death sentence). See also *Schofield v. Holsey*, 281 Ga. 809, 811-812 (II), n. 1 (642 SE2d 56) (2007) (holding that the combined effect of counsel's errors should be considered).

1. *The Mitigating Evidence Presented at Trial*

We first review the mitigating evidence that the sentencing jury considered. As discussed above, counsel's mitigation defense involved showing that Sears came from a respected, well-liked family; that, despite some problems at school, Sears was also well-liked, had never been in any serious trouble, had no history of violence, and was considered polite and well-mannered by teachers, friends, and neighbors; that Williams' influence, Sears' own youth and immaturity, and

the fact that he was stranded over 400 miles away from home all contributed to his commission of uncharacteristically violent crimes; that he cooperated with police; and that sentencing him to death would devastate his parents, his family, and their friends, who were well-regarded members of his community.

At the sentencing phase, counsel supported their mitigation defense by presenting the testimony of persons who "kn[e]w Demarcus Sears [for] other than what he did on October the 7th, 1990," and they began with Sears' mother, the only family member to testify. Although counsel initially felt that Sears' father would make a strong mitigation witness because he was a disabled veteran with a successful career in the Veterans Administration ("VA"), Gary testified that they decided against putting him on the stand "because he thought that [Sears] . . . was just a bad person." However, Treadaway briefly introduced Mr. Sears to the jury during his guilt/innocence phase opening statement as a Vietnam veteran who was now wheelchair-bound as the result of a service-related parachute accident. Then at the sentencing phase, Gary elicited from Ms. Sears that the gentleman that had been "sitting with [her] all week" was Sears' father, whom she had married in 1969 after meeting him while she was a nurse and he was a patient at a VA hospital. Through her and other witnesses' testimony, the jury learned the following: Mr. and Ms. Sears had four children, two boys and twin girls who were eight years younger than Sears, and they had moved to the "middle-class" neighborhood where they now lived in 1980; Mr. Sears was a strong, quiet man and a good father and provider, enabling Ms. Sears to be a full-time homemaker when the children were young; Mr. Sears coached Sears' baseball and football teams and took him hunting and fishing as a youth; Mr. Sears had worked with the VA for 25 years, had recently retired partly because of health concerns, and had most recently served as chief of prosthetics at a VA hospital; and Mr. Sears had brought Sears' sisters to Georgia to visit Sears during his incarceration. Ms. Sears testified that she now worked as a nurse at a state mental hospital.

Through Ms. Sears' testimony, the jury also heard about the following: Sears' young age at the time of the crimes; the fact that he began having "a lot of behavioral problems" in the ninth grade; his receipt of "special tutoring" in areas in which he struggled and his subsequent placement in an S.B.H. class; his withdrawal from and re-enrollment in high school; and the two encounters that Ms. Sears had had with Williams, which included asking Williams to leave the Sears' home because she discovered him having sex with a "young lady" in Sears' bedroom and Williams' subsequent return to the Sears' home to help Sears move out just days prior to the crimes. She

described how close she and the other family members were to Sears, and she testified that Sears spoke to them by telephone several times a day since his incarceration and that she, Sears' father, and Sears' sisters had traveled to Georgia to visit Sears numerous times. During her testimony, the defense introduced several photographs of Sears, including a family photograph and a photograph of Sears' youth baseball team with his father as coach. While acknowledging Sears' "tragic mistake in taking the life of Ms. Wilbur" and its "terrible impact on the Wilbur family," she asked the jury to give her son a life sentence because of his age and the effect a death sentence would have on the Sears' family.

On cross-examination, Ms. Sears was asked about the type of behavioral problems that Sears displayed in the ninth grade, and she stated that Sears violated school rules by wearing his pants below his waist "and things of that nature," that the source of his problem was "his attention span," and that, if not "motivated," Sears found "things to do in the classroom that annoyed the other students." While she conceded that the family lived in a "nice" neighborhood and that Sears had always "had enough money to do the things that kids needed to do," she also testified that he had worked hard at a fast food restaurant after he left school and had earned enough money to buy "a lot of clothes and things like that." She also rebutted the nonstatutory aggravating testimony of a police officer in Sears' home community that, as a juvenile officer, she went to the Sears' residence in 1987 because she had been informed that Sears was carrying a .22 caliber pistol and that she recovered the gun from Sears after speaking with Sears' mother, who was "unaware of the situation."[14] Ms. Sears testified to the contrary that she herself took the gun from a young man who was visiting Sears in the family's residence and that it was she who then called the officer to come to her home so that she could turn the gun over to the officer.

Next, counsel presented the testimony of William Creecy, a businessman, who testified to the following: he had known Sears and his family since Sears was ten years old, as the two families lived on the same street, and he considered Sears' father "his best friend"; Sears had often visited in Creecy's home with him and his family; Sears was always mannerly and respectful, Sears got along well with everyone, and Creecy always referred to Sears as "Mr. Personality" because he was personable and friendly; and it was "a shock" and seemed "totally out of character" that Sears "ha[d] done the things he had been convicted of." Creecy asked the jury not to consider the

---

[14] Sears was not charged with any crime in connection with this incident.

death penalty as a sentencing option, and he testified on cross-examination that no one provided for his trip to Georgia to testify but that he, instead, drove down at his own expense because he wanted to do anything he could to help.

Kelly Spencer testified that she was a 21-year-old pre-law student who also worked as a legal secretary and office manager of a law firm, that she had known Sears and his family since she was 11 years old, and that she and Sears were friends. Her testimony included the following: before Sears' arrest, she regularly visited Sears and his family members at their house, as "friends were always welcome"; she had attended high school with both Sears and Williams; Williams was spiteful, "purposely mean" to teachers and students, and intimidating, particularly to women; Sears, in contrast to Williams, was respectful and mannerly; she reacted with "[t]otal disbelief" when she heard that Sears was involved in the crimes; she had never seen Sears with knives, brass knuckles, or weapons of any kind, nor had she seen any evidence of weapons in Sears' home, including in his room or in the basement where Sears and his brother shared space. Spencer then asked the jury to spare Sears' life because of his age and the impact that a death sentence would have on his family. On cross-examination, she responded negatively to the prosecuting attorney's inquiry as to whether Sears had been abused or was "underprivileged in any way."

The next witness, Diane Slaughter, testified to the following: she was a mental health specialist at a hospital in the Cincinnati area with an associate's degree in social work and experience in the areas of social work and juvenile detention; she had been friends with the Sears' family for 14 years; Sears had spent a lot of time at her house, which often included baby-sitting her children, even when they were sick; she considered Sears both "courageous" and "compassionate" for taking on the responsibility of learning how to use a nebulizer to administer breathing treatments to her asthmatic son; Sears had enjoyed attending church with her and her children where she was a choir member until a change in her work schedule prevented her from attending; her initial reaction upon hearing that Sears was involved in the crimes was "a state of disbelief," as "it was totally out of character" for him, and her children "were so shocked" upon learning of Sears' crimes that they were unable to attend school for "a couple of days"; and she had talked to Sears by telephone several times since his incarceration, and he had told her "that he realized that he had to pay the consequences for his behavior." Slaughter expressed how much she still loved Sears while at the same time acknowledging "that a life ha[d] been taken" and that, as a mother, "[she] hurt for the Wilbur family." However, she asked the jury "to consider life rather

than death" for Sears because, "with some professional help, if he doesn't have added insight into what has happened, hopefully, he can gain some," because "maybe this . . . can be a lesson . . . for some other young man or woman," and because of the pain that a death sentence would cause the family.

Next, Evelyn Mercer, Sears' ninth grade guidance counselor, testified that she knew personally all members of the Sears' family except for Sears' twin sisters. She also testified to the following: Sears was referred to her as a ninth grader because he was having problems completing his schoolwork; after he was tested by the psychologist and was "deemed to be a learning disability student,"[15] he was placed in learning disability tutoring classes; when he continued to have "self-destructing" problems, such as talking, making noises, or disturbing those around him, he was placed in an S.B.H. class for grade ten; Sears was a cooperative student; his parents always came to conferences and provided support; and she was "shocked," "distraught," and "very sad" when she heard about Sears' involvement in the crimes. Mercer stated that, while she was not a therapist or a clinical counselor, she was a licensed professional counselor and had extensive experience working with students, and she opined that Sears "need[ed] help," "was easily led," and had a "nice side," although he perhaps appeared "calloused." She also testified that, while Wilbur's death was a tragedy, it would be another tragedy "if Sears were to die," and she asked the jury to spare his life in order to give him "a chance to become more of [the] human being [that she] thought he [wa]s capable of becoming" and because of the impact a death sentence would have on "his little twin siblings," "the mom and dad," and "a lot of other people[.]" On cross-examination, she opined that Sears' "arrogant air" was deceiving and actually a sign of low self-esteem, that Sears "wasn't a bad kid," that he was not aggressive or violent, and that he just could not keep his behavior under control.

The last witness, Josie Russell, testified that she had worked as a psychiatric nurse with Sears' mother at the state mental hospital, that Sears spent a lot of time at her house working on ceramics when he was younger but seemed to "drift away" as he became a teenager; that the news of the crimes and Sears' involvement had "devastated" the community; and that she had traveled down from Ohio to ask the jury to give Sears a life sentence.

In his closing argument, Gary asked the jurors to consider the following mitigating factors: (1) Sears' youth and immaturity at the

---

[15] There is no evidence in the record that Sears' "learning disability" has ever been diagnosed.

time of the crimes; (2) his non-violent history; (3) the fact that Sears was asking for the same "harsh sentence" as Williams, who had pled guilty to the same indictment on which Sears was being tried and who counsel argued was a drug dealer, a thief, and "the detail man in this case"; (4) the fact that Sears would also "be tried, convicted, and punished in Kentucky, . . . where the murder occurred" and where the prosecution was also seeking the death penalty; (5) the fact that Williams initially lied to the police, whereas "Sears was candid from the start" and cooperated with police by accompanying them to his parents' home and directing them to the physical evidence; (6) the character of Sears' family and the impact sentencing Sears to death would have on its members; and (7) a pretrial letter from defense counsel to the district attorney confirming Sears' offer to plead guilty to the charges in exchange for two consecutive life sentences, which the defense entered into evidence as authorized by the law at that time, see *Mobley v. State*, 262 Ga. 808, 811 (4) (426 SE2d 150) (1993) (holding that a defendant may introduce evidence at the sentencing phase of his capital murder trial that the State refused his offer to plead guilty in exchange for a life sentence), disapproved by *Mobley v. State*, 265 Ga. 292, 299-300 (18) (b) (455 SE2d 61) (1995) (holding that evidence of such offers to plead guilty is no longer admissible).

2. *The Mitigating Evidence Presented in the Habeas Proceeding*

Sears submitted a substantial amount of family background, social history, and expert mental health testimony in his habeas proceedings that he contends would have led at least one juror to vote for a sentence other than death had the evidence been presented at the sentencing phase of his trial. See *Humphrey v. Morrow*, 289 Ga. 864, 867 (II) (717 SE2d 168) (2011). As a preliminary matter, we find no merit to Sears' contention that the habeas court unreasonably discounted the affidavit testimony that he submitted simply because it was presented in affidavit form. There is no indication that the habeas court did not follow Georgia law that permits habeas petitioners to introduce sworn testimony by way of affidavits. See OCGA § 9-14-48 (a), (c). However, that testimony is generally subject to the rules of evidence. See *Whatley v. Terry*, 284 Ga. 555, 565 (V) (A) and n. 29 (668 SE2d 651) (2008) (stating that this Court does not assume that facts alleged in affidavits are correct when considering whether a jury in reasonable probability would have found a petitioner's new testimony persuasive, and urging habeas courts to make factual and credibility findings and *rulings on admissibility* where affidavits are submitted as evidence). Therefore, the habeas court did not act improperly in concluding that Sears' affidavits "contained a great

deal of hearsay and speculation testimony, which would have not been allowed before the jury." The habeas court was also authorized to consider the reliability of the affidavit testimony upon which Sears' mental health experts relied in analyzing Sears' case for prejudice. See id. ("[I]n considering whether a jury in reasonable probability would have been swayed by additional testimony not presented by counsel, [this Court] . . . consider[s] the experts' testimony in light of the weaker affidavit testimony upon which that testimony, in part, relied."). Sears further contends that the Warden would have challenged the affidavit testimony during the habeas proceedings if it were so assailable. However, the Warden *did* raise numerous specific objections to this evidence, and the habeas court explained in its 2008 Order, which was adopted in relevant part by the 2011 Order, that the court considered those objections and that, while the exhibits were admitted, the court "weighed the evidence . . . and [gave] it the appropriate legal and factual consideration in light of the objections."

Relying on *Porter v. McCollum*, 558 U. S. 30, 43 (III) (130 SCt 447, 175 LE2d 398) (2009), Sears also contends that the habeas court "unreasonably discounted . . . to irrelevance" much of the mitigating evidence that he submitted in his habeas proceedings by finding that it lacked record support or had aggravating potential. However, *Porter* does not forbid state courts from considering the reliability or harmful aspects of proposed mitigating evidence. See *Ponticelli*, 690 F3d at 1299 (III) (B) (2) (stating that *Porter* is an application of *Strickland* and does not alter the ordinary rule that courts " 'must consider the totality of the evidence before the judge or jury' " (quoting *Strickland*, 466 U. S. at 695 (III) (B))). Moreover, "our assessment of how a jury might have reacted to the additional evidence that [Sears] has presented in the habeas court is an assessment of the legal question of prejudice, which we perform de novo." *Morrow*, 289 Ga. at 870 (II) (B). Thus, we address Sears' specific contentions that the habeas court unreasonably discounted his new evidence in our discussion below only to the extent that they are relevant to our de novo assessment.

> a. *Evidence Regarding Sears' Social History and Family Background*

Sears submitted affidavit testimony that he claims demonstrates that he was reared in a "damaging family environment," that he was sexually abused, that he exhibited unusual childhood behavior and significant mental deficits in school, that he abused drugs,

and that he suffered several childhood head injuries.[16] Upon our review of this testimony, we conclude, as the habeas court did, that much of it consists of hearsay and speculation that would not have been admissible at trial. See *Smith v. State*, 270 Ga. 240, 249 (12) (510 SE2d 1) (1998) (holding that the hearsay rule is not suspended in the sentencing phase), overruled on other grounds by *O'Kelley v. State*, 284 Ga. 758, 768 (3) (670 SE2d 388) (2008). We also note that "[a]ffidavit testimony regarding the addiction, dysfunction, and brutality that spanned multiple generations of [Sears'] family that occurred before [Sears'] birth or did not directly affect [Sears] would not have been significantly mitigating." (Punctuation omitted.) *Hall v. Lee*, 286 Ga. 79, 90-91 (II) (B) (4) (b) (684 SE2d 868) (2009). A summary of the most relevant affidavit testimony that likely would have been admissible at trial includes the following evidence.

(i) *Evidence Regarding Sears' Family Environment*

Sears presented testimony that his parents were "complete opposites and disagree[d] on how to handle a lot of things," that both parents were unfaithful to one another, and that Sears witnessed his father "being emotionally, and sometimes physically, abusive toward [Ms. Sears]," including not treating her with affection and respect, not speaking or looking at her, humiliating and belittling her, not attending her birthday party, once pulling her around by her hair during an argument in Sears' presence, and stating with reference to her that it was "cheaper to keep the b---- than leave her" and that he never would have married her if he had not been in a wheelchair. Ms. Sears testified that she stayed in the marriage because of "the lifestyle" that Mr. Sears provided her.

Demetrius Sears,[17] Sears' older brother by eleven months, testified that his parents argued "all the time," and he opined that this was because his father, who considered it "important to be a good provider," "was the type to work all the time and come home to cook a meal" and that his mother was the "party-type." He testified that his parents "[s]ometimes" had "screaming knock-down-drag-out fights," but he described only two specific physical confrontations, which occurred in Sears' presence, namely: (1) when Sears was age seven or

---

[16] Because the testimony regarding Sears' childhood head injuries does not involve any alleged abuse or neglect but is significant to Sears' new expert mental health evidence, it is discussed in conjunction with that evidence in subdivision (b) (i) below.

[17] The Warden submitted certified copies of Demetrius Sears' prior convictions showing that he had at least two felony drug convictions in 1993 when Sears' trial took place. At that time, "[a] witness in a criminal or civil case [could] be impeached by evidence that he ha[d] been convicted of a felony or a crime of moral turpitude." *Witcher v. Pender*, 260 Ga. 248, 248 (392 SE2d 6) (1990). Thus, had Demetrius testified, he would have been subject to impeachment.

eight, Mr. Sears "snapped" and came at Ms. Sears, and Demetrius brought her a knife when she screamed for him to do so; and (2) when Sears was age twelve, Mr. Sears "twisted [Ms. Sears'] arms into [a] pretzel behind her," Demetrius obeyed Ms. Sears when she yelled for him to call the police, and the police asked his mother to leave when they arrived and saw his father in a wheelchair and his mother "fired up." The testimony also shows that Sears' parents separated and divorced in 1984, Ms. Sears and the children moved to North Carolina where they lived with Ms. Sears' boyfriend, Mr. Sears brought Ms. Sears and the children back to the family's residence in Ohio in 1987 pursuant to Ms. Sears' request, and the family resumed living together.

Regarding parenting, several affiants testified that it seemed that Sears' parents showed favoritism toward Sears' siblings and that Sears often complained that he alone had to babysit his younger sisters. Affiants also testified that Ms. Sears was too permissive,[18] did not spend much time with her children, was not supportive of them, called them obscenities and terms such as "stupid" and "clumsy," usually disciplined them by yelling at them, and sometimes disciplined Sears by "hit[ting]" him with "whatever was handy" or "whip-[ping]" him with a belt. Ms. Sears testified that, while Sears did not get a lot of whippings, the ones she gave him were "memorable," and that she whipped him for trying to erase an "F" from his report card and for his arrest for a drug offense in the tenth grade. Some affiants faulted Ms. Sears for not seeking professional medical care for Sears as promptly as they thought she should have after he burned his hand while cooking at age 15.

Affiants testified that Mr. Sears was "rigid and stern," moody, and a "strict disciplinarian" and that he disciplined the children as if they were in the military, "ordered" Sears to do yard work regardless of the weather, pressured him to do well in sports and outdoor activities, and always followed through with "serious consequences" if he did something wrong. A family friend testified that, when Sears and Demetrius were young, they were punished by holding their hands out in front of them while Mr. Sears "beat" them with a ruler and that, if the boys flinched, Mr. Sears would start over with his punishment. Ms. Sears testified that Mr. Sears was "too harsh," that he once whipped Sears "so long and so hard" for using his towel that she grabbed the belt and told Mr. Sears that he would have to hit her

---

[18] Demetrius testified that his mother "didn't object much" to his participation in sexual activity as a teenager and ignored or even condoned his participation in the use and sale of drugs.

if he did not stop, and that Mr. Sears twisted Sears' hand "and almost broke it" after Sears took the automobile, apparently without permission, when he was "older."

According to Demetrius and Mr. Sears, Mr. Sears made 10-year-old Sears and Demetrius dig a hole in the back yard large enough to bury an approximately four by three feet piece of glass that the boys "shot out" in the basement. Demetrius testified that they dug for "hours and hours" before their father decided they "had gotten it right." Mr. Sears testified that "digging the hole would teach [the boys] that their actions had consequences." Mr. Sears also testified that he poured ice cold water on the boys to wake them up when they refused to get up after being repeatedly called and that he made them run extra laps after ball practice to teach them to be in better shape than their opponents. Sears' cousin testified that she once saw Mr. Sears grab Sears by the collar and hit him so hard in the chest that Sears fell down. However, this affiant did not provide the circumstances surrounding this incident or Sears' age at the time, nor did anyone else testify to a similar incident, although some affiants testified that Mr. Sears wrestled too aggressively with the boys when they were young.

Regarding testimony that Mr. Sears was "verbally abusive" to Sears, both Sears' S.B.H. teacher and one of his art teachers testified about a conference with Mr. Sears regarding Sears' academic performance. While it is unclear whether both affiants testified about the same conference,[19] they described Mr. Sears' behavior similarly. Sears' former S.B.H. teacher stated that, while she explained to Mr. Sears that even though Sears had only made "incremental progress" in her class, he would succeed academically "over time," Mr. Sears' response indicated that he "would not accept less than perfection" and caused her to "suspect[ ] that [Sears] was the victim of verbal abuse." Sears' former art teacher testified that Mr. Sears "severely criticized [Sears] and meant it." Given that Sears' former high school counselor testified at trial that Sears' parents attended conferences and were always cooperative, the prosecuting attorney could have reasonably argued that Mr. Sears' outburst was the result of his frustration with both Sears and the program. Therefore, we do not conclude that the jury would have found it significantly mitigating in the context of all the evidence presented at trial and in the habeas proceedings.

---

[19] There are no documents concerning any conferences or the reasons for Sears' being removed from the S.B.H. program in his school records submitted in the habeas proceeding.

Based on her teaching experience, Sears' S.B.H. teacher also opined that Sears "suffered from some form of mental illness and needed psychological or psychiatric therapy," "was out of touch with reality, more so than the normal teenager, and had anger issues that needed to be addressed." She also testified that she "was *not* surprised when [she] heard about [Sears'] arrest" (emphasis supplied), and she blamed Sears' "lack of self-worth" and his feelings of "abandon[ment] by his family and especially by his father." The aide in the S.B.H. class testified that she was teaching a regular class by the time that Sears was mainstreamed at his father's insistence, that Sears was placed in her class, and that, when she was not able to give Sears individual attention, he was withdrawn because of his behavioral issues, for which she also blamed Sears' family life. We conclude that the jury would have found testimony that Sears had "anger issues" that needed addressing and that his former S.B.H. teacher was *not* surprised by his arrest and, by implication, by his commission of horrendous crimes, to be aggravating and contradictory of the testimony presented by the defense at trial that Sears was friendly and non-violent and that his arrest was shocking to those who knew him.

Furthermore, in considering whether the jury was likely to consider the new evidence mitigating, this Court must consider the totality of the evidence before the jury. See *Strickland*, 466 U. S. at 695 (III) (B). The evidence presented at trial showed Sears' father to be a disabled veteran who had overcome some difficult obstacles, worked hard, and provided well materially for his family and who had demonstrated an interest in Sears by attending school conferences, taking him fishing and hunting, teaching him how to play sports, and coaching his ball team. Moreover, Mr. Sears testified in the habeas proceeding that he had "tried to influence [his] children to adopt a strong work ethic," that he had "attempted to show [his children] by example how to provide for a family," that he had used the disciplinary methods that he had learned in the military in that he had rewarded Sears for good behavior and withheld privileges for bad behavior, and that he had sometimes used a belt for punishment but that the mere threat of physical punishment had often been sufficient. Mr. Sears lamented that, "[i]n retrospect, [his] discipline approach [had] failed," and he admitted that he was "still perplexed as to what discipline would [have] work[ed] with [Sears]." Mr. Sears also testified that he had had a conversation with Sears about his goals and purpose in life approximately a year prior to his arrest and that Sears had told him that he just wanted to use people and that he had no interest in working, and Mr. Sears testified that there was nothing that he could do to motivate Sears to work either at home or at an outside job, which "frustrated and baffled [him]." The jury could

have reasonably concluded from this testimony that Mr. Sears cared about Sears and that his approach to discipline, while stern, was not so unreasonable that it significantly mitigated Sears' moral culpability for his horrendous acts.

Moreover, some of the testimony showed that, while Sears' parents may have had different child-rearing philosophies and may have lacked some parenting skills, both parents were involved with their children and attempted to provide the best for them, as it showed that Sears' parents took an active part in his education, involved him in extracurricular activities, participated in extended family activities, and ensured that he attended school regularly at least until he turned 18. Affiants also stated that, despite being in a wheelchair, Sears' father was independent, tried to teach his sons to be independent, spent time with them fishing and playing basketball, and worked with Sears to help him excel in sports and outdoor activities. Ms. Sears testified that Mr. Sears made his sons lift heavy weights when they were little "[not] because he was mean, but in order to make them better prepared for life." Although Demetrius testified that he could not recall his father's ever hugging him or Sears, telling either of them that he loved them, or complimenting them, he also stated that his father thought that the way to demonstrate his love for them "was to toughen [them] up." The prosecuting attorney could have used this testimony in conjunction with the testimony that Mr. Sears was a good provider and spent time with Sears to argue that Sears' father did love and care for him but simply did not express it in a demonstrative way.

In addition, much of the testimony submitted in the habeas proceeding is not entirely favorable to Sears, as it depicts his childhood as being one of privilege and permissiveness. Sears' aunt testified that Sears' parents gave their children too many material things and too many privileges. Other affiants testified that Sears' family had "a big house with a swimming pool and two cars," that the boys were always well-dressed, and that the Sears children had allowances bigger than any other child in the neighborhood. This testimony would have further supported the prosecuting attorney's argument at trial that, in Sears, "we have a person, privileged in every way, who has rejected every opportunity that was afforded him."

"In any event, all of the family dysfunction testimony, even taken together and credited as true, is weak and a far cry from the horrific childhood circumstances that have been held sufficient to satisfy the prejudice prong in a capital case." *DeYoung v. Schofield*, 609 F3d 1260, 1291 (III) (E) (11th Cir. 2010) (finding that the defendant was not prejudiced by the omission of mitigating evidence that included

testimony that his father was "hyper-rational, judgmental, authoritarian, obsessive, and emotionally distant" and that his parents "showed [him] little affection"). Compare *Rompilla v. Beard*, 545 U. S. 374, 391-392 (II) (C) (125 SCt 2456, 162 LE2d 360) (2005) (stating that omitted mitigating evidence included evidence that the petitioner's parents were alcoholics; that his father frequently beat his mother, bragged about his infidelity, beat the petitioner, and locked him in an excrement-filled dog pen; and that the petitioner slept in an unheated attic and went to school in rags); *Wiggins*, 539 U. S. at 534-535 (III) (noting omitted mitigating evidence, inter alia, of "severe privation and abuse in the first six years of . . . life" and "physical torment, sexual molestation, and repeated rape during . . . subsequent years in foster care"); *Williams*, 529 U. S. at 395 (IV) (finding that omitted mitigating evidence of defendant's "nightmarish childhood" included his parents' imprisonment for criminal neglect of him and his siblings, his severe and frequent beatings by his father, and his commitment to an abusive foster home). Thus, we conclude that trial counsel's failure to present Sears' new evidence about his allegedly damaging home environment did not result in prejudice sufficient to support the success of his overall ineffective assistance of trial counsel claim.

(ii) *Evidence of Sexual Abuse*

Demetrius Sears stated in his affidavit that, as children, their "older teenage[d]" cousin took the younger cousins one at a time into a closet while playing "hide and seek" in order to touch them inappropriately, that there were "plenty of times when [this cousin] had [Sears] in the closet," that he did not know whether Sears was able "to wiggle away or run off," that he also saw this same cousin put Sears in his lap as a child and rub against him in an inappropriate manner, and that he never told anyone about this abuse until he was a teenager.[20] Sears did not testify in his habeas proceedings, and the only evidence that he himself has ever claimed to have been sexually abused is the hearsay affidavit testimony of Rodney Tillman, Sears' friend, that Sears told him that someone "molested" him and Demetrius when they were young. The remaining affidavits that contain similar testimony are all hearsay based upon Demetrius' statements.[21]

---

[20] Ms. Sears testified that Demetrius did not tell her about these incidents until after Sears' trial.

[21] We also note that another of Sears' cousins testified that the Sears cousins were staying overnight together when she was approximately 14 years old and Sears was "10 or 11" years old, that this same older teenaged cousin entered her bedroom after she was in bed, that she pretended to be asleep, that he attempted to put his hands between her legs and that she locked

We conclude that this evidence would have carried little weight with the jury for several reasons. Regarding Demetrius' testimony, we conclude that the jury would not have found it very persuasive, considering its equivocal nature, Demetrius' obvious interest in his brother's case, and, as previously noted, the fact that he was subject to impeachment based on his prior felony convictions. As to Tillman's hearsay affidavit testimony, he testified that he had only known Sears for a relatively short period of time when he and Sears began to get "high" together on "weed" every morning and that it was during one of their conversations while they were "hanging out" that Sears told him only that "someone" had "molested" him and Demetrius when they were young without providing any further details. Thus, Sears failed to show that this testimony is anything other than unreliable hearsay. See *Gissendaner v. State*, 272 Ga. 704, 714-715 (12) (532 SE2d 677) (2000) (holding that the rules of evidence are not suspended in the sentencing phase but that they may, under proper circumstances, yield to the need to present *reliable* mitigating evidence). Most significantly, Sears did not report that he had ever been sexually abused to either of the habeas mental health experts who examined him, and, as Dr. Strickland noted in his report and affirmed through his affidavit, Sears denied any sexual abuse to the mental health professionals treating him at the Georgia Diagnostic and Classification Center. Thus, we conclude that the omission of the weak evidence submitted in the habeas proceedings that Sears was sexually abused as a child did not result in prejudice sufficient to support the success of his overall ineffective assistance of trial counsel claim.

  (iii) *Evidence of Unusual Childhood Behavior and Mental Deficits in School*

Several of Sears' relatives testified by affidavit that Sears demonstrated unusual behavior even as a young child. We conclude that a jury would have found much of this testimony unpersuasive, either because of its generic nature or because it is internally inconsistent or inconsistent with other evidence in the record.[22] The testimony by

---

her legs together, that he left her room, and that she heard him walking down the hall toward where Sears, his brother, and his cousin were sleeping. However, we conclude that a jury would not have found this weak circumstantial evidence significantly persuasive.

 [22] For instance, the testimony of one of Sears' maternal aunts that Sears "always appeared to be in a trance state" appears inconsistent with her testimony that Sears "was hyperactive and always talked too loud." The same aunt also testified that Sears "acted like he was mildly retarded," but one of Sears' habeas mental health expert witnesses testified that Sears scored in the average and low average range, respectively, on tests measuring mental ability and intelligence. Other relatives testified, without explanation, that Sears "was just a little off in a way that is difficult to describe," that they suggested to Ms. Sears "that she should seek

several affiants that they had never seen Sears exhibit any violent behavior would have been cumulative of that presented at trial. See *Hill*, 277 Ga. at 267 (VI) (A) (holding that the petitioner was not prejudiced by the omission of cumulative evidence).

Although Ms. Sears testified at trial that Sears was "just a typical little boy," she testified by affidavit in the habeas proceedings that Sears was "a tad off the wall, like his dad." She claimed the following: as a child Sears preferred to play with "sticks and nails," even though he had "regular toys," and that she was puzzled by this "unusual behavior"; that Sears once became non-responsive and appeared not to be breathing and that she rushed him to the hospital, where the doctors found nothing medically wrong with him after conducting tests; and that she began to believe that Sears had a "split personality or a chemical imbalance" when he was in the eighth and ninth grades because of his strange behavior. Had Ms. Sears testified at trial as she testified in the habeas proceedings, we find it incredible that jurors would have considered it surprising that a boy might choose to play with "nails and sticks" at some point rather than "regular toys." Furthermore, considering the inconsistencies between Ms. Sears' testimony at trial and in the habeas proceedings, her failure to provide any examples of the "strange behavior" that led her to believe that Sears had a "split personality or a chemical imbalance," and the lack of medical records regarding Sears' non-responsive episode or the tests that were conducted on him, we conclude that a jury would not likely have found her testimony persuasive.

Regarding Sears' school problems, his former teacher in his S.B.H. class testified that he was placed in her class "because of behavioral and academic problems" and that he "struggled" with reading and mathematics, "had speech problems," "was easily distracted[,] and had difficulty staying on task." Two of Sears' former art teachers testified that Sears was a gifted art student. One of his art teachers testified that Sears was easily distracted and often exhibited "fast-paced mannerisms," such as repeatedly thumping the desk, shaking his legs, or twitching. Except for the reference to Sears' art talent and "speech problems," this testimony is largely cumulative of the testimony presented at trial through Sears' mother and ninth grade counselor. See *Hill*, 277 Ga. at 267 (VI) (A) (finding that the petitioner was not prejudiced by the omission of cumulative evidence). The jury likely would not have found testimony about Sears'

counseling for him," that Sears was "never a normal child," that "he was in his own zone," that he played by himself, and that he did "weird things."

unspecified speech problems significant in light of the fact that four witnesses in the guilt/innocence phase of his trial testified about conversing with Sears a few hours prior to Wilbur's kidnapping and yet not a single one of those witnesses mentioned Sears' having "speech problems" or their having difficulty communicating with or understanding him. As to the testimony about Sears' proficiency in art, the State likely would have elicited on cross-examination that, even in a subject in which he had exceptional talent, Sears apparently did not put forth much effort, as his grades in his art classes were far from outstanding. Viewing the new testimony regarding Sears' unusual childhood behavior and mental deficits collectively, we conclude that it would have had little mitigating effect, particularly in light of the testimony that the jury did hear that Sears had a learning disability, a limited attention span, problems with "self-destructing" behavior, and academic problems and testimony that he had received special tutoring and had been placed in a class for severely behaviorally handicapped students.

### (iv) *Evidence of Marijuana and Cocaine Abuse*

Unquestionably, trial counsel were aware of Sears' drug use, because they argued, as Sears testified at the hearing on the admissibility of his pretrial statement, that Sears' statement was given while he was under the influence of drugs. However, Sears denied being under the influence of drugs or alcohol at the time of the crimes in his statement to police, and there is no evidence to the contrary. Moreover, a police officer testified at trial that Sears told her after his arrest that he did not use drugs. However, Sears alleges that affidavit testimony that he submitted shows that he regularly abused marijuana and cocaine around the time of the crimes. In that respect, a review of the testimony of Kenneth Burns, Sr., and his son, William,[23] shows the following: at age "16 or 17," Sears began smoking marijuana with Burns, Sr., William, William's brother, and Demetrius at Burns' house; neither Burns, Sr., nor William testified as to how much marijuana Sears smoked; and, while both of them testified that Sears "had access" to cocaine through Demetrius, neither of them testified that Sears used cocaine.

Sears' friend, Rodney Tillman, testified that he and Sears smoked "weed" together every morning at Sears' house. He also testified that, because Demetrius smoked "primos"[24] and thus had them around the

---

[23] Both Kenneth Burns, Sr., and William Burns had felony convictions at the time of Sears' trial, and their testimony would have been subject to impeachment. See *Witcher*, 260 Ga. at 248.

[24] One of Sears' habeas mental health experts testified that "primos" are marijuana cigarettes laced with cocaine.

Sears' home, he "imagine[d]" that Sears also smoked them. Demetrius, in fact, testified that Sears wanted to participate in dealing drugs with him but that he considered Sears "too slow and too odd to run with [him]" and "brushed him off" and that Sears got in trouble for bringing "*fake*" drugs to school after Demetrius was expelled from high school for selling drugs there. However, the only testimony that Demetrius provided regarding Sears' drug use was that he "used to . . . smoke up . . . every day" with "Rodney," and the only "Rodney," i.e., Rodney Tillman, who testified in the habeas proceedings testified only that he smoked "weed" with Sears. Accordingly, the evidence presented in the habeas proceedings shows only that Sears smoked marijuana regularly beginning as early as 16 years of age and does *not* show that he ever used cocaine.

Furthermore, "presenting evidence of a defendant's drug addiction to a jury is often a 'two-edged sword'; while providing a mitigating factor, such details may alienate the jury and offer little reason to lessen the sentence." *Pace v. McNeil*, 556 F3d 1211, 1224 (V) (11th Cir. 2009). We particularly find that to be the case here. The evidence of Sears' drug use is weak, and there is no evidence that he used any drugs other than marijuana. Nor is there any evidence that Sears began using drugs at an extremely young age, that he was using drugs at the time of the crimes, or that drugs were connected with the crimes in any way, and testimony that Sears was a drug abuser would have negated much of the testimony at trial regarding Sears' good character. Compare *McPherson*, 284 Ga. at 233-235 (5) (finding prejudice where counsel failed to present psychiatric mitigating evidence about the defendant's cocaine dependence where he was on a cocaine binge during the crimes, the thrust of the State's case was his addiction and intoxication, the evidence would not have conflicted with the chosen mitigation strategy, counsel was on notice of the State's intention to present evidence regarding his addiction, and the omitted evidence would have "greatly undermined" the State's only argument in support of the death penalty). Therefore, we conclude that the jury likely would not have found the evidence presented here about Sears' drug use to be significantly mitigating.

b. *Expert Mental Health Evidence*

Sears presented the affidavit, deposition, and live testimony of Dr. Tony Strickland, a neuropsychologist with expertise in examining traumatic brain injury and the effects of substances on brain function. Dr. Strickland testified that, in 2004, he performed a neurological assessment of Sears that included reviewing numerous documents related to Sears and the affidavits submitted by Sears in the

habeas proceedings[25] and discussed above and conducting a 12- to 16-hour evaluation of Sears in which he interviewed, observed, and tested Sears.

According to Dr. Strickland, the results of his testing showed the following: Sears scored in the severely impaired range on three out of four tests that measure higher executive function and abstract problem solving skills; in the area of attention/concentration, Sears performed in the severe impairment range when required to maintain divided attention but in the average range when required to perform simpler tasks of passive attention, although he had difficulty sustaining attention over time; Sears' score of 91 on the General Ability Measure for Adults placed him in the average category of mental ability, and his full scale IQ score of 91 on the Wechsler Abbreviated Scale of Intelligence placed him in the low average range of intellectual functioning; Sears performed in the average range on most measures in the areas of language, verbal/visual memory, motor function, and visual/perceptual/organizational function; and he was generally able to express himself well. Based on the results of validity tests and his own observations of Sears, Dr. Strickland opined that there was "little chance" that Sears was malingering. He also opined that Sears' test results were consistent with "frontal/executive deficits likely caused predominantly by the synergistic effects of repeated traumatic brain insults and chronic marijuana and cocaine use"; that, with a high degree of predictability, persons with deficits like those from which Sears suffers generally make poor decisions, become increasingly disorganized under stress, and have problems with planning, sequencing, and impulse control; that these effects likely were more profound in Sears at the time of the crimes; and that his current diagnoses of Sears included anxiety disorder not otherwise specified with depressive features, cognitive disorder not otherwise specified secondary to head trauma and drug use, a history of a learning disorder not otherwise specified, and polysubstance abuse in remission.

Sears also submitted the affidavit, deposition, and live testimony of Dr. Richard Dudley, who is a psychiatrist. Dr. Dudley opined that "[Sears'] capacity for sound reasoning and decision making is severely impaired" and was even more impaired at the time of the crimes due to his "cognitive deficits," anxiety disorder mixed with depression, and a "profound" but unspecified personality disorder. Dr. Dudley

---

[25] Both Dr. Strickland and Sears' other habeas mental health expert, Dr. Richard Dudley, also relied on the affidavit of Danielle Benning, which we have been unable to locate in the habeas record.

based his opinion on a ten- to eleven-hour interview of Sears, a review of the same documents reviewed by Dr. Strickland and the same affidavits relied on by Dr. Strickland and previously discussed, a consultation with Dr. Strickland regarding his findings and test results, and interviews with Sears' mother, father, and a maternal aunt.

While the testimony that Sears suffers from some brain impairment and mental health problems is uncontroverted and certainly has potential mitigating value, we conclude that he was not prejudiced by the omission of this evidence at trial for the following reasons: (1) the weakness of much of the evidence upon which Sears' mental health experts relied to support their testimony and diagnoses; (2) the aggravating potential of this evidence; (3) the testimony's inconsistency with the evidence at trial; and (4) the strength of the aggravating circumstances in Sears' case. We expound upon each of these reasons below.

(i) *The Weakness of the Evidence Upon Which This Testimony Relied*

While Dr. Strickland testified that he relied in part on his neuropsychological testing results and his observations of Sears to diagnose Sears with frontal lobe deficits, he also testified that he did not base his opinion on those two factors alone but also on the fact that the test results were consistent with Sears' "reported history of brain trauma" and "the psychiatric symptomatology and the substance-induced changes in brain function that have been demonstrated" to accompany cocaine abuse. Thus, the strength or weakness of the evidence regarding Sears' history of brain trauma and cocaine abuse is relevant in determining the weight that the jury would likely have given this evidence. See *Whatley*, 284 Ga. at 565 (V) (A) (considering the testimony of a habeas petitioner's expert "in light of the weaker affidavit testimony upon which that testimony, in part, relied").

Regarding Sears' history of brain trauma, Sears contends that the habeas court made a clearly erroneous factual finding that there was "no concrete evidence" to support the "possible head injuries" upon which Dr. Strickland partly relied. Our review shows that the only records of medical treatment received by Sears before his incarceration that are in the record concern his burned hand at age 15, and Dr. Strickland reported that Sears told him that this was the only occasion that he had ever been hospitalized. Thus, Dr. Strickland testified, he relied on Sears' self-reporting, family affidavits, and the fact that Sears has two scars on his head to verify his history of head injuries.

According to the affidavit testimony, Sears was treated at a hospital after he was hit in the head with a golf club at age eight or

nine, after he hit his head on an end table, and after he lost consciousness as the result of a head injury suffered in a skating rink accident. Certainly, scars on Sears' head coupled with testimony describing personal knowledge of specific incidents in which Sears suffered injuries to his head constitute "concrete" evidence that Sears at some point in his life suffered head injuries; however, even assuming that the habeas court's factual finding here is clearly erroneous, we do not find the error significant. In his report, Dr. Strickland relied on the skating rink and golf club incidents and an incident apparently self-reported by Sears and not supported elsewhere in the record that he was struck in the head with a hatchet. At the evidentiary hearing, he also testified that "[Sears] would frequently ingest [drugs] to the point where [he] would pass out and would strike [his] head[ ]," which also has no support in the record. The habeas court was authorized to consider the evidence upon which Dr. Strickland's opinion was based and, specifically, to consider that Sears submitted no medical records to verify the severity of these head injuries or to show whether Sears could have possibly suffered *brain injuries* as a result of these head injuries. See *Windom v. Secretary, Dept. of Corrections*, 578 F3d 1227, 1249 (II) (A) (11th Cir. 2009) (finding it unlikely that a death row petitioner's expert testimony "would have had much impact on the [sentencer's] choice of sentence" considering, among other things, that the opinions "lacked a medically verifiable foundation, e.g., hospital records confirming that [the petitioner] in fact suffered head trauma leading to brain damage").

We also find noteworthy Dr. Strickland's reliance on Sears' "significant" drug abuse history, particularly his abuse of cocaine, as a cause of his frontal lobe deficits. With respect to the significance of Sears' abuse of cocaine to his diagnosis, Dr. Strickland testified that "every time you ingest a primo, there is another insult to the brain," that "[t]he brain does not make the distinction between . . . blunt force trauma . . . [and] a substance-induced insult to the brain," and that the result is that "[t]he neurochemistry is still compromised, particularly if you're ingesting a compound . . . such as cocaine, which causes blood vessels to constrict." However, Dr. Strickland acknowledged that he relied upon Sears' self-reporting for the information that he had a "significant history of marijuana and cocaine use that began at [ages] 12 to 13 and increased in its intensity through ages 14 to 18 up to incarceration" and that *he did not review any documents or interview anyone who corroborated Sears' account.* At trial, the State would certainly have challenged Dr. Strickland's diagnosis, given the fact that there was *no testimony* that Sears ever used cocaine or that his marijuana use began before the age of 16. See *Humphrey v. Nance*, 293 Ga. 189, 213 (II) (C) (3) (b) (ii) (744 SE2d 706) (2013) (finding it

reasonable to conclude that an expert's testimony had been discredited, where the State "challenged the source and veracity of several alleged events in [the defendant]'s history" that the expert relied on to form his diagnoses based on the lack of testimony, or on "arguably contradictory testimony," regarding the alleged events).

We also find significant to our prejudice analysis Dr. Dudley's testimony that it was "not surprising" that Sears developed "self-esteem" and "abandonment" issues as a result of his parents' being "psychologically and physically abusive" to him and that Sears' actions on the night of the crimes were the result of the "difficulties" with his parents. The evidence regarding Sears' parents' verbal and physical abuse of him is hardly compelling. Moreover, the presentation of testimony that Sears' parents' "abandonment" and abuse were responsible for his "profound" personality disorder and that his own voluntary drug use was partly responsible for his brain damage and cognitive deficiencies would have negated or displaced the strong testimony that trial counsel presented at trial regarding the good character of Sears and his family. See *Cannon v. Gibson*, 259 F3d 1253, 1277-1278 (III) (C) (1) (b) (10th Cir. 2001) (finding that a death row petitioner was not prejudiced by the omission of mitigating evidence of his "serious brain damage" and lack of impulse control, where such evidence would have "negated" or "displaced . . . the mitigation evidence actually adduced at trial" that portrayed him as a "kind, compliant, and responsible individual whose involvement in the murder was an aberration").

We also find it significant that Dr. Dudley attributed Sears' actions at the time of the crimes to his cognitive deficits and personality disorder but, as the habeas court found, "[w]hen confronted with the particulars of [Sears'] crime[s], . . . Dr. Dudley admitted that [Sears] would not discuss the crime with him." Sears contends that the habeas court's finding is clearly erroneous. We disagree. Although Dr. Dudley responded affirmatively when asked whether Sears provided him with "the factual scenario of how the crime played out," his testimony explaining his answer shows that he was referring to the fact that he and Sears "talked about the whole trip down here [from Ohio to Georgia] and what was the planning of the trip down here and what happened with the trip, where the plans fell through," in other words, how Sears' and Williams' "poor planning" led to their being stranded in Georgia. Dr. Dudley also testified that Sears told him that Williams attacked the victim in the parking lot and forced her into the automobile with them, which was consistent with his confession.

However, when asked about the return trip to Ohio made in the victim's automobile, Dr. Dudley testified to the following: he and Sears did not talk "that much" about that trip or the facts of the crime;

he "more or less" tried to talk with Sears about those matters by asking him what they did on the return trip to Ohio; Sears "talked about traveling to Ohio" but "was unclear about the rape" and "unclear" about the murder other than "that [the victim] ended up in the woods"; he asked Sears about what happened when he let the victim out of the automobile, and Sears "didn't want to talk about it"; and, while he asked Sears about what he said in his confession, he only "discussed the circumstances of it." Thus, the habeas court's finding that Dr. Dudley admitted that Sears would not discuss the facts of the crime with him is not clearly erroneous, and we conclude that this testimony would discredit Dr. Dudley's opinion that Sears' deficits were responsible for his behavior at that time.

Finally, Drs. Dudley and Strickland relied on evidence submitted in the habeas proceedings that Sears had suffered from "significant" mental deficits from an early age. However, there is little evidence in the record to support such a conclusion. As previously discussed, the testimony from family members regarding Sears' "unusual" childhood behavior is not persuasive. As to Sears' school records, a third grade "learning disability evaluation or academic underachievement" assessment reported that Sears was "neurological[ly] normal" and had an "overbearing father with unrealistic expectations for his child." A third grade psychological assessment reported that Sears scored in the average range on the Wechsler Intelligence Scale for Children - Revised but that in the classroom he was functioning on a second grade level in reading and math, and the report "noted that certain behaviors seem[ed] to be interfering with [Sears'] learning process, including poor direction-following, and lack of self-confidence."[26] In an eighth grade evaluation, the teacher who referred Sears for the evaluation due to his difficulty in reading and English, stated that Sears "did not try," "daydreamed, drew pictures, and did not get his work completed." The evaluating psychologist concluded that Sears "was not at that point of his development where he would willingly take responsibility for organizing his schoolwork," "was [not] disciplined enough to be a self-starter and finisher," and "need[ed] a firm, consistent program that insist[ed] that he work first and engage in privileges later."[27] Sears contends that the habeas court erred in concluding that "the jury might reasonably find this information to be aggravating in nature and contradictory to the reports

---

[26] This exhibit submitted by Sears is missing the last page, on which the evaluator's conclusions and signature should have appeared.

[27] As the habeas court noted, this exhibit submitted by Sears is missing a page, which appears to include a key portion of the assessment, including part of the conclusion.

recounted by the witnesses at trial." We agree, because this description of Sears is largely cumulative of what the jury *did hear* regarding Sears' academic and behavioral struggles at school. Nevertheless, the school records do not provide persuasive support for the testimony of Sears' mental health experts that Sears' struggles at school were the result of *significant* mental deficits.

Sears also contends that the habeas court erred in casting aside the entirety of the affidavit testimony concerning his early learning problems on the basis that it was "inconsistent" with the records that he produced in the habeas proceedings, as the evidence can be reconciled. However, as discussed above, we also conclude that much of this affidavit testimony was speculative, internally inconsistent, or inconsistent with other evidence in the record. Moreover, upon our review of the 2011 Order and the record, we cannot conclude that any of the habeas court's factual findings in this regard were clearly erroneous. See *Upton v. Johnson*, 282 Ga. 600, 602 (652 SE2d 516) (2007) ("When there is evidence to support the habeas court's factual findings, those findings cannot be found to be clearly erroneous.").

(ii) *The Aggravating Potential of This Evidence*

In light of the guilt/innocence phase evidence that Sears committed four violent capital felonies in quick succession and the sentencing phase evidence that the commanding officer at the Cobb County detention center could not recall an inmate in his 17 years of experience who had caused more trouble than Sears, which is discussed more thoroughly below, a reasonable jury could have viewed evidence that Sears suffers from frontal lobe damage as aggravating. See *Martinez v. Dretke*, 404 F3d 878, 889-890 (III) (2) (5th Cir. 2005) (stating that "evidence of organic brain injury presents a 'double-edged' sword" because of its association with poor impulse control and a violent propensity and, thus, future dangerousness). Moreover, this evidence could have been used by the prosecuting attorney to support his sentencing phase closing argument that Sears was "a Defendant out of control" who "cannot comply with the rules of a community" or "a structured . . . pretrial detention center." Nevertheless, Sears contends that Dr. Strickland's testimony explaining that Sears' behavior was symptomatic of his brain damage and would improve as he aged could only have been mitigating in light of the fact that the jurors had already heard from the State about Sears' misbehavior in jail. However, Sears misrepresents Dr. Strickland's testimony.

Rather than testify that Sears' behavior would improve as he aged, Dr. Strickland opined that the probability would be extremely low that Sears would perform "criminal acts of violence" when incarcerated, "given the fact that [he] is far removed from the

substance use[ and] that [his] current behavior within a very structured and controlled environment did not reveal a pattern of problems and difficulties being in [an] extraordinarily controlled setting where [he's] monitored." At the time of Dr. Strickland's testimony, Sears had been incarcerated for approximately 15 years, and the vast majority of those years had been on death row. Regardless of what Sears' behavioral history in prison might have been at the time of Dr. Strickland's testimony, the relevant issue is what Dr. Strickland's testimony regarding Sears' "pattern of problems and difficulties" while incarcerated could have been, and how it would have been assessed by the jury, *at the time of trial.*

In that respect, at the sentencing phase of Sears' trial, the State presented the testimony of the assistant division commander of the Cobb County detention center, where Sears had been incarcerated for almost three years while awaiting trial. This witness testified that at the time of trial the center housed over 900 inmates and that approximately 40 of those inmates were "death penalty and murder defendants"; that, while the witness was not familiar with every inmate, he was familiar with Sears due to "incidents" in which Sears was involved; that Sears' disciplinary problems with other inmates had resulted in his reassignment approximately 38 times; and that, in the 17 years that the witness had been employed with the sheriff's office, he had never had more trouble with an inmate than he had had with Sears. Given the fact that Sears was apparently three years removed from any substance use and yet, according to this testimony, was still exhibiting bad behavior in a structured and controlled environment, we conclude that the jury would not find very persuasive Dr. Strickland's opinion that Sears' behavior would improve once he was "far removed from the substance use." Moreover, the basis that Dr. Strickland offered for his opinion at the habeas proceeding, a history that did not reveal "a pattern of problems and difficulties" within the highly controlled and monitored environment of death row, did not even exist at the time of trial.

Furthermore, we conclude that a jury would likely have found Dr. Strickland's testimony that Sears exhibited "a narcissistic sort of grandiosity" to be aggravating. Sears contends that the habeas court erred in reaching a similar conclusion because Dr. Strickland's description of Sears is "far less off-putting" than the characterization that the jury heard that he was "an average young man from a life of advantage who committed shocking violence out of anger and selfishness and who displayed arrogance and a lack of remorse." Not surprisingly, the State did use the mitigating evidence presented by trial counsel to argue a similar characterization of Sears to the jury. See *Cullen v. Pinholster*, ___ U. S. ___ (131 SCt 1388, 1409 (III) (D) (1)

n. 19, 179 LE2d 557) (2011) (noting that any diligent prosecuting attorney will challenge "whatever mitigating evidence" the defense puts on and cannot be expected to argue the evidence in the light most favorable to the defendant). However, trial counsel presented a mitigation defense showing that Sears came from a respected family and that he was also well-liked both by adults and his peers, had never been in any serious trouble, had no history of violence, committed his horrific crimes only in a desperate attempt to return home, and expressed after his arrest that he realized that he had to pay for those crimes.

Although both Drs. Dudley and Strickland testified that Sears was not delusional and did not suffer from visual or auditory hallucinations, Dr. Strickland described Sears as exhibiting "a narcissistic . . . grandiosity" through "fantastical" boasting about "parts of his life." He testified that one of the focal points for Sears' grandiosity was his "sexual prowess" and that the "most striking" of his grandiose accounts were related to his "sexual history" and included "innumerable sexual experiences." Sears contends that Dr. Strickland's testimony would have helped jurors understand his behavior because Dr. Strickland explained that his grandiosity is a defense mechanism that he employs to shield himself from feelings of "worthlessness" caused by his parents' abuse of him. However, given the weakness of the evidence regarding Sears' parents' abuse and Williams' graphic testimony at trial regarding Sears' rape of the injured, terrorized, and handcuffed victim, including that she prayed, cried, and pleaded desperately with Sears to stop his sexual attack on her, we agree with the habeas court's conclusion that the jury would have viewed Dr. Strickland's description unfavorably.

We also conclude that the evidence of Sears' drug use would have undercut the persuasiveness of the brain damage evidence. Dr. Strickland acknowledged on cross-examination at the evidentiary hearing that, if he had testified in front of the jury in Sears' case, he would have opined that Sears' voluntary drug abuse exacerbated Sears' problems and that "the magnitude of [Sears' impulse control issues] and/or number of [Sears'] deficits would likely be less" if Sears had chosen to stop using drugs. While Dr. Strickland opined that Sears would have suffered some frontal lobe damage due to his history of brain trauma even if he had never used drugs, given the weak evidence regarding Sears' "brain trauma," had Dr. Strickland's testimony been presented at trial, the State likely would have vigorously argued that any significant impairment that Sears suffered from was the result of his voluntary drug use, a factor that a reasonable jury could consider aggravating. See *Tompkins v. Moore*, 193 F3d 1327, 1338 (11th Cir. 1999) (stating that showing drug abuse

"is a two-edged sword which can harm a capital defendant as easily as it can help him at sentencing").

(iii) *This Evidence's Inconsistency with the Evidence Presented at Trial*

When considered in isolation, some of Sears' new testimony appears to be significant, particularly Dr. Strickland's testimony that Sears scored at or below the first percentile on two standardized assessment tests measuring cognitive function, "making him among the most impaired individuals in the population in terms of his ability to suppress competing impulses and conform behavior only to relevant stimuli." However, when asked by the habeas court exactly what Sears' test results meant in terms of "daily life," Dr. Strickland explained that Sears is impulsive, exhibits poor planning, and does not appreciate the consequences of his actions. He also opined that Sears lacked "autonomy" and that his "biggest challenge[s]" included a compromised "abil[ity] to exercise behavior that is . . . of [his] own decision-making." Likewise, in explaining how, in his opinion, Sears' "specific psychiatric, emotional and cognitive disturbances" directly led to his behavior on the night of the crimes, Dr. Dudley testified that Sears "would have had little ability to reject any action taken or suggested by Mr. Williams, not only because of Sears' cognitive inability to propose an alternative," but also because his "personality issues" would have caused him to become "tremendously dependent upon Mr. Williams."[28]

The testimony of Drs. Strickland and Dudley loses much of its impact when viewed together with the evidence presented at trial. In addition to mitigating evidence presented by the defense, the jury also had before it the following State's evidence, much of which the prosecuting attorney cited in support of his sentencing phase closing argument that "the man running this show" was Sears: all four witnesses who encountered Sears and Williams on the day of Wilbur's abduction, including three Waffle House customers and a police officer, testified that Sears did "all the talking"; all three Waffle House customers testified that Sears alone had control of the briefcase containing knives, brass knuckles, and a set of handcuffs; Sears led police to the discovery of the brass knuckles on his bedroom closet shelf and the briefcase containing knives under his bed; Sears alone

---

[28] Dr. Dudley also testified that Sears' behavior at the time of the crimes was made even more impulsive and disorganized as a result of his mother's refusal to provide him any assistance in getting home from Atlanta when he called her. Ms. Sears testified in the habeas proceedings that she did not hear from Sears during the entire time that he was in Georgia. Dr. Dudley relied on hearsay testimony or Sears' self-report for the information that Sears contacted his mother and that she would not help him get home.

raped Wilbur with no encouragement or assistance from Williams; and Sears alone murdered Wilbur without encouragement or assistance from Williams.

The evidence also entitled the jury to believe that, prior to leaving the Waffle House and walking to Kroger, Sears had been given bus fare and directions to a shelter and that he had spoken with the shelter's staff, who had agreed that he and Williams could stay there, and that Williams, who knew how to hot-wire an automobile, had suggested that they, instead, steal an unoccupied automobile in order to travel home to Ohio. However, Sears had deliberately rejected those two options and had told Williams that they were going to wait until dark to take a vehicle. Then Sears, who was over six feet tall, patiently waited until Wilbur drove into the Kroger parking lot and selected her — a five feet four inch 59-year-old wife and mother weighing less than 125 pounds — as his victim because her automobile appeared capable of making the trip back to Ohio. He watched Wilbur enter the grocery store and, while she purchased her groceries, he prepared for her abduction and eventual rape and murder by removing from his briefcase a set of brass knuckles, a pair of handcuffs, and a knife with its accompanying holster, which he put around his belt. While waiting, he also had Williams exchange coats with him, which enabled him to avoid the possibility that any witnesses who happened to see his brutal attack of Wilbur in the parking lot would later describe her attacker as wearing a coat like the distinctive "Raiders' jacket" that several witnesses had seen him wearing earlier that day and also enabled him to later tell the police that Williams had access to his brass knuckles because they were in the pocket of his coat that Williams was wearing. He also put on gloves, which he would wear during the entire time that he was inside Wilbur's automobile, thereby preventing the police from connecting him with the vehicle through fingerprints.

After watching Wilbur come out of the store, put her groceries in the trunk, replace her cart, and put her key in her automobile's door lock, Sears assaulted her about the face and head with the brass knuckles as she entered the automobile, knocking her to the ground. Despite Wilbur's desperate attempts to escape, including screaming for help and attempting to climb onto the vehicle's hood, Sears shoved her, bleeding and injured, inside the automobile and picked up Williams, who drove while he pulled Wilbur into the back seat and bound her hands "directly" behind her back with a set of handcuffs that he knew had no key. Sears went through Wilbur's purse, taking her money to purchase gasoline for the trip and fast food for himself and Williams. For a significant portion of the trip, including before entering the gas station and driving through the fast food restaurant,

he made Wilbur lie wedged face down on the floorboard between the front and rear seats, covered with overcoats and book bags, and he threatened to kill her if she made a sound. An hour into the abduction, Sears again climbed into the back seat area with the victim, tore most of the clothing she was wearing off of her, raped her, and then threw her clothing out the window.

Once they reached a deserted stretch of highway in Kentucky, he told Williams to pull over and Wilbur to get out of the automobile. When Wilbur begged to remain inside, Sears told her that he was going to let her go and walked her sixty feet from the highway, down an embankment, and into shoulder-high grass, where he made her get down on the ground while she repeatedly pleaded for her life. Then, taking the knife that he had strapped to his belt *prior to her abduction more than five hours earlier*, he stabbed her at least twice in the neck, striking a vertebra. Leaving her partially nude body lying where it was not likely to be quickly discovered, he went back to Wilbur's automobile and told Williams that he would drive the rest of the way home, and he "flung" the knife and its holster out the window sometime "through the course of that night." Before abandoning Wilbur's automobile the following morning when it became disabled, he and Williams removed all items connected to them and Wilbur's purse, which they threw in a dumpster. After his arrest and before making a statement to police, he asked two different officers what was "the maximum penalty time . . . for these things," and he told police in his statement that he "knew [his] time was coming," that "[he] did what [he] did," and that he was "about to pay [his] consequences."

On cross-examination, the State would surely have inquired of Drs. Strickland and Dudley as to how their theories regarding Sears, including his tendency to become disorganized under stress and his inability to plan and sequence, to reject any actions suggested by Williams, and to appreciate the consequences of his actions, fit into such a scenario. Further, under Sears' proffered new trial strategy, counsel in the sentencing phase closing argument to the jury would have tried to use Sears' frontal lobe abnormalities, particularly the testimony regarding his impulsivity, to reduce his moral culpability for his attack on Wilbur. However, the State would likely have countered by arguing that the evidence showed that this was not, as the defense's mental health experts suggested, an impulse crime in which Sears was suddenly confronted with having a kidnapping victim with which to contend. Rather, the prosecuting attorney would likely have argued, as he actually did at trial, that Sears' crimes "w[ere] planned" and then "carried out." Thus, the jury could reasonably have concluded that "[t]he evidence depicted a man capable of

planning and executing criminal acts and willing to victimize anyone who would get in his way, which w[ould have been] more than sufficient" to lead a reasonable jury to find the testimony of Drs. Strickland and Dudley unpersuasive. *Nance*, 293 Ga. at 219 (II) (C) (3) (b) (iv).

### (iv) *The Strength of the Aggravating Circumstances in Sears' Case*

Finally, analysis of the prejudice prong of Sears' ineffective assistance claim also requires consideration of the aggravating circumstances associated with Sears' case to determine whether "the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U. S. at 695 (III) (B). This is not a case "where the weight of the aggravating circumstances or the evidence supporting them was weak." (Citation and punctuation omitted.) *Suggs v. McNeil*, 609 F3d 1218, 1232 (III) (B) (11th Cir. 2010). The jury was presented with and eventually found beyond a reasonable doubt the existence of the statutory aggravating circumstances that three capital felonies — armed robbery, rape, and murder — accompanied the victim's kidnapping with bodily injury and that the kidnapping with bodily injury was outrageously or wantonly vile, horrible, or inhuman in that it involved torture and an aggravated battery to the victim and involved Sears' depravity of mind. See OCGA § 17-10-30 (b) (2), (7).[29]

The evidence presented against Sears at the guilt/innocence phase was overwhelming, and it left no reasonable doubt that Sears was the moving force behind the crimes and that he alone raped and murdered Wilbur. The State also presented the non-statutory aggravating evidence previously discussed regarding Sears' bad behavior in the three years that he had been incarcerated awaiting trial, and an officer testified that, after his arrest, Sears told her that he killed the victim because she was "part of society" that he felt kept him from making his goal of being a rap singer and that he expressed no remorse for his acts. Thus, considering all of the expert mental health and lay witness testimony that Sears presented in his habeas proceeding along with the mitigating evidence actually presented at trial, we still conclude that the new mitigating evidence presented in

---

[29] The trial court appropriately charged the jury in accordance with this Court's proposed charge on the (b) (7) statutory aggravating circumstance. See *West v. State*, 252 Ga. 156, 161-162 (313 SE2d 67) (1984) (Appendix) (supplying a pattern jury charge to inform jurors, among other things, that a finding of depravity of mind requires a finding "that the defendant, as a result of his utter corruption, perversion or immorality, committed aggravated battery or torture upon a living person" and that a finding of torture requires a finding "that the defendant intentionally, unnecessarily and wantonly inflicted severe physical or mental pain, agony or anguish upon a living victim").

the habeas proceedings would not in reasonable probability have resulted in a different sentencing verdict for Sears' brutal crime. See *Sochor v. Secretary, Dept. of Corrections*, 685 F3d 1016, 1030 (III) (A) (11th Cir. 2012) (noting the difficulty of showing prejudice as the result of failing to present mitigating evidence in a death penalty case involving a murder "accompanied by torture, rape or kidnapping").

3. *Conclusion*

Therefore, even assuming that trial counsel were deficient in all the ways alleged by Sears, after independently reweighing all of the aggravating and mitigating evidence, we conclude that, absent the alleged errors, there is no reasonable probability that at least one juror would have voted for a sentence other than death, and our confidence in the outcome of this case has not been undermined. See *Strickland*, 466 U. S. at 694-695 (III) (B). Accordingly, we affirm the habeas court's denial of Sears' ineffective assistance claim.

*Judgment affirmed. All the Justices concur.*

DECIDED NOVEMBER 18, 2013.

*Troutman Sanders, Robert P. Edwards, Jr., Jarrod F. Loadholt, Katheryn E. Klimko*, for appellant.

*Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Sabrina D. Graham, Mitchell P. Watkins, Assistant Attorneys General*, for appellee.